UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>JUAN TACURI,<br><br>               Defendant. | 22 Cr. 622 (AT) |

## GOVERNMENT'S SENTENCING MEMORANDUM

 

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Benjamin A. Gianforti
Michael D. Maimin
Assistant United States Attorneys
 -Of Counsel-

**Table of Contents**

I.   Background ........................................................................................................ 2

    A.   Offense Conduct ....................................................................................... 2

    B.   Victim Impact ........................................................................................... 7

    C.   Procedural History .................................................................................... 7

II.  Argument............................................................................................................ 8

    A.   The Governing Legal Framework............................................................. 8

    B.   The Court Should Impose a Sentence At or Near the Top of the Applicable Guidelines Range of 108 to 135 Months' Imprisonment ........................................................................................ 10

        1.   The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment........................................................... 11

        2.   The Need to Promote Respect for the Law and to Afford Adequate Deterrence ................................................................. 13

        3.   The History and Characteristics of the Defendant ..................... 15

        4.   Restitution ................................................................................. 17

III. Conclusion ....................................................................................................... 18

Juan Tacuri was one of the most successful promoters of the multi-million-dollar, cryptocurrency Ponzi scheme Forcount. For over two years, Tacuri was a key participant in this far-reaching fraud, which was built on false promises of guaranteed returns that were designed to dupe Tacuri's victims—often working-class men and women, though the scheme swept up thousands of people from a variety of backgrounds—into parting with whatever money they had. Tacuri said that the money was being invested in cryptocurrency markets and mining technology. Tacuri repeated these lies over and over again. And as the numerous victims who have come forward attest, Tacuri was particularly shameless about telling these lies, claiming that he was making outlandish amounts of money from his work on the purported Forcount project and underlining the point by, among other things, dressing up for Forcount promotional events in gaudy designer clothes worth thousands of dollars. By the time the Forcount Ponzi scheme collapsed in or about 2021, Tacuri and his coconspirators had taken millions of dollars from victims, leaving them with nothing of value in return.

The United States Probation Office ("Probation") calculates the sentencing Guidelines applicable to Tacuri as 108 to 135 months' imprisonment, and recommends a bottom-of-the-Guidelines sentence. Tacuri asks for an unspecified sentence "well-below" the bottom of his Guidelines range. Neither recommendation accounts for the brazenness of Tacuri's fraud and the lasting and substantial harm that Tacuri imposed upon his many victims through his years of lies and deceit. The Government recommends a sentence at or near the top of the Guidelines range of 108 to 135

months' imprisonment. Such a sentence is well supported by the record and would be sufficient but not greater than necessary to serve the ends of Section 3553(a).

## I.  Background

### A.  Offense Conduct

Prior to his involvement in the Forcount scheme, Tacuri promoted numerous other cryptocurrency Ponzi schemes, including (1) MyTraderCoin,[1] (2) Donation Wins, (3) BTC Global, (4) LyonCoin, and (5) GladiaCoin. (PSR ¶ 61).

In or about 2017, defendant Francisley da Silva[2] created Forcount, a large-scale crypto-Ponzi/pyramid scheme—targeting primarily working-class, Spanish-speaking customers in the United States and elsewhere—which falsely claimed to be a legitimate multilevel marketing company ("MLM") focused on cryptocurrency investment and mining company that would earn its investors profits in exchange for their purchase of certain purported cryptocurrency-related investment products. (PSR ¶¶ 16, 19-29). By no later than in or about early 2018, Tacuri began promoting Forcount and recruiting "investors" in Florida, where he was then residing. (PSR ¶¶ 43, 62). Tacuri is an Ecuadorean national who has been living illegally in the United States for many years. (PSR ¶ 120).

---

[1] *See* https://www.utah.gov/pmn/files/498219.pdf (last visited September 27, 2024).

[2] Da Silva is a Brazilian national who resides in Brazil, a country that does not extradite its own citizens to the United States. The Government's understanding, however, is that Da Silva is currently in custody in Brazil in connection with Da Silva's creation and operation of the Forcount scheme and possibly other frauds.

2

Tacuri repeated the lies behind Forcount to victims during large promotional events around the country and in online tutorials conducted via Zoom. (PSR ¶¶ 20, 40, 43). In reality, victims' money was not invested in cryptocurrency trading or mining as promised; instead, Tacuri and his Forcount co-conspirators executed an elaborate ruse to convince victims that the company was actually mining and trading cryptocurrency, when they were instead paying victims their purported returns through new victims' money, while diverting much of the victims' money for themselves. (PSR ¶¶ 19-20). In other words, the truth was that Forcount operated as a Ponzi scheme. (*Id.*) All the while, Tacuri and his co-conspirators were using investor money to line their own pockets and to further promote the criminal scheme through public events in order to dupe yet more victims. (*Id.*)

At these promotional events, Tacuri and other Forcount promoters hyped the scheme's "compensation plan" and boasted about their own financial success, including by wearing designer clothing and showing up in luxury cars. (PSR ¶ 20). Tacuri also made outlandish claims about how much he was earning from the Forcount project. Such claims included that he was making over $100,000 per week, telling victims that this was possible for them too if they chose to hand over their money to Forcount. Indeed, Tacuri urged his victims to sell assets and take out loans to keep feeding the Forcount machine and his own greed. (PSR ¶ 40).

The core business proposition of Forcount was that victims' money would be invested in cryptocurrency like Ether and cryptocurrency mining, and that victims would passively earn money through Forcount's expertise in these activities. (PSR ¶¶

3

21-22). Forcount promoters, including Tacuri, made various promises to victims regarding their investment returns, including guaranteed daily returns, guaranteed weekly returns, and/or doubling of their investments within six months. (PSR ¶ 21). The Forcount compensation plan also included various bonuses and other, potentially more lucrative incentives to recruit more victims into the scheme, as opposed to selling them legitimate products as some MLM's do. (PSR ¶¶ 22-28).

Victims primarily invested by either giving cash directly to promoters or making cash deposits in promoters' bank accounts, as well as by peer-to-peer transfer, wire, and check. Tacuri received victim funds in all of these ways. (PSR ¶¶ 21, 41, 59, 60, 75). After investing, victims received an online account (commonly referred to as a "back office") on Forcount's website, where they could view their investment principal, purported passive "earnings," and their place in their investment tree (*i.e.*, those above and below them in the pyramid); request withdrawals; make complaints; and so forth. (PSR ¶ 21). When victims tried in vain to withdraw their principal and/or earnings, Tacuri and Forcount's other promoters did everything they could to brush them off, claiming that victims would have to pay a large fee to withdraw, giving excuses about technical difficulties, and/or telling other lies to buy time. (PSR ¶¶ 29, 39, 42).

Successful promoters like Tacuri made significant amounts of money from the scheme by selling their so-called back-office balances, which were purportedly denoted in actual cryptocurrencies, to other investors. (PSR ¶ 30). Because many of Forcount's investors were not sophisticated cryptocurrency users, they were easily

4

fooled into buying the cryptocurrency they thought they needed to buy into the scheme—i.e., promoters like Tacuri's back-office balances—from promoters directly, rather than from legitimate exchanges. (*Id.*). But what victims were buying was not real cryptocurrency with actual value—it was just valueless points in the back office. (*Id.*).

Similarly, early in the life of the scheme, Tacuri and Forcount's other promoters began heavily advertising a supposedly proprietary Forcount cryptocurrency known as "Mindexcoin." Tacuri and others claimed to victims that Mindexcoin would take off in value after it was introduced on major exchanges and began being used as a means of exchange. In reality, Mindexcoin was a fraudulent liquidity play typical of other cryptocurrency Ponzi schemes. Tacuri's and his co-conspirators took it a step further when Da Silva announced in or about late 2019 or early 2020 that all investors' holdings denoted in other cryptocurrencies (which, again, was in and of itself a lie) would be converted to Mindexcoin. (PSR ¶¶ 31-36).

This conversion, coupled with victims' escalating difficulty in withdrawing their money from the Forcount back office, led to a promoter revolt in Chicago in or about late January 2020. The event was attended by numerous promoters and victims. Da Silva and Tacuri appeared remotely via videoconference. At a certain point during the conference, while Tacuri was logged into the videoconference, a promoter who had been receiving more and more complaints from his principally Mexican investors stood up and began complaining about the withdrawal issues and told the

5

group that he had begun receiving threats. Other senior promoters, including co-defendant Ramon Perez, attempted to get hotel security to eject this promoter. (PSR ¶¶ 36-38). Despite this promoter revolt, Tacuri continued to promote the scheme and take in funds from victims through 2020 and into 2021. (PSR ¶¶ 39, 43, 58).

At some point in or about late 2021, the scheme (after changing its name to Weltsys) came to an end. In the months leading up to this point, victims found it ever more difficult and then eventually impossible to withdraw their principal investment and purported earnings from the Forcount portal. Complaints to Forcount's promoters, including Tacuri, increased markedly during this period, but they kept on taking in new money anyway. Promoters would initially deflect blame or give excuses for why money could not be withdrawn, until they stopped responding entirely or began promoting new schemes with promises of making up losses from Forcount. (PSR ¶ 39). For example, Tacuri immediately began promoting another Ponzi scheme called "PayMoney," which was created by David Carmona, who had been instrumental previously in the creation of the cryptocurrency Ponzi scheme Icomtech, as well as other crypto-Ponzi schemes. (PSR ¶ 61).[3]

---

[3] On October 13, 2022 shortly before the indictment was handed down in this matter, a grand jury sitting in this district indicted David Carmona and others for wire fraud conspiracy. As alleged in that indictment, Carmona was the creator of the IcomTech cryptocurrency Ponzi scheme. *See United States v. Carmona*, 22 Cr. 551 (JLR). On December 22, 2023, Carmona pleaded guilty to the indictment's single count. He will be sentenced by Judge Rochon on October 4, 2024.

6

### B. Victim Impact

The staggering scale of Tacuri's role in the Forcount scheme is reflected in the many victims who have bravely come forward to hold him accountable. (*See* PSR ¶¶ 74-96). Letters from those victims, with translations where appropriate, have been partially provided to the Court on a rolling basis. The Government will collate these letters and their translations and provide them to the Court in short order under separate cover.

In short, these victims tell painful stories about Tacuri convincing them to part with, in some cases, tens of thousands of dollars that they could not afford to lose but ultimately did. And in at least one case, Tacuri was made aware of a victim's tragic personal circumstances and fleeced them nonetheless.

### C. Procedural History

On November 15, 2022, a Grand Jury in this District returned an indictment charging Tacuri, along with others, with conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering. Tacuri was arrested in the Southern District of Florida on December 14, 2022 and remanded on consent. He has remained incarcerated since that time, including at the Metropolitan Detention Center (the "MDC") from approximately October 5, 2023 to the present, after previously being held at the Westchester County Jail.

On June 5, 2024, Tacuri pleaded guilty before this Court, pursuant to a plea agreement, to conspiracy to commit wire fraud. In the plea agreement, Tacuri agreed that the applicable Guidelines range was 108 to 135 months' imprisonment based on the same calculation later adopted by Probation.

## II.   Argument

### A.   The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range": that "should be the starting point and the initial benchmark." *Gall v. United States*, 55 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 578 U.S. 189, 200, 204 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)); *see also, e.g., United States v. Solis*, 18 F.4th 395, 405 (2d Cir. 2021) ("District courts are to use the Guidelines as a 'starting point' and then make an independent sentencing determination, taking into account the 'nature and circumstances of the offense and the history and characteristics of the defendant' and all other statutory factors.").

After that calculation, however, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); "the kinds of sentences available," 18 U.S.C. § 3553(a)(3); the Guidelines range itself, *see* 18 U.S.C. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see* 18 U.S.C.

8

§ 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," 18 U.S.C. § 3553(a)(6);[4] and "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their

---

[4] Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008). Because Section 3553(a)(6) was intended to address national disparities, "a district court may—but is not required to—consider sentencing disparity among co-defendants under 18 U.S.C. § 3553(a)(6)." *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009) (citing *United States v. Frias*, 521 F.3d 229, 236 & n.8 (2d Cir. 2008)). By this same logic, this Court may—but is not required to—consider sentencing disparities with other defendants in this District.

9

analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### B. The Court Should Impose a Sentence At or Near the Top of the Applicable Guidelines Range of 108 to 135 Months' Imprisonment

A sentence at or near the top of the applicable Guidelines range of 108 to 135 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. The Section 3553(a) factors most applicable in this case include the nature and circumstances of the offense of conviction, the seriousness of the offense, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, and the history and characteristics of the defendant. All of these factors weigh in favor of the Government's recommended sentence, and in no way support a sentence "well-below" the Guidelines range, as Tacuri requests.

### 1. The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment

The nature, circumstances, and seriousness of the offense and the need for just punishment warrant a very significant sentence of imprisonment. The Forcount scheme, in which Tacuri was a key participant, stole at least $13.9 million from thousands of unwitting "investors." The actual loss amount is likely substantially higher, as many investors paid into the scheme using actual cryptocurrency that the Government has been unable to definitively trace, much less recover[. The scope of the fraud was massive, with Tacuri alone taking in millions of dollars from his victims (as reflected in the consent preliminary order of forfeiture the Court entered on June 7, 2024 (Dkt. 83), which he spent not on legitimate cryptocurrency investment but on gaudy luxury items like those discussed above and real estate. Contrast this with the limited means and desperate circumstances of many of Tacuri's victims, who did not have money to burn and indeed have reported losing important savings to the Forcount scheme.

Simply put, Tacuri was among the top tier of Forcount's promoters, who were instrumental in perpetuating the fraud that the scheme's victims were cutting-edge cryptocurrency "investors" who could look forward to complete financial independence and saying goodbye to their workaday jobs. It was Tacuri and his co-conspirators who got the financial independence and the luxurious lives off the backs of their unsuspecting victims. Tacuri knew how to make people trust him, and he abused that trust to get them to "invest" large sums of money—often hard-earned savings, loans, or proceeds from the sale of important assets—with him or his co-conspirators. The

11

nature of this offense was extremely serious, calling out for just punishment, including a very significant period of incarceration.[5]

With respect to avoiding unwarranted sentencing disparities, the Government would draw the Court's attention to the significant sentences handed out in the Airbit Club prosecution—*United States v. Dos Santos, et al.*, 20 Cr. 398 (GBD)—which also involved a crypto-Ponzi scheme. As reflected in founder Pablo Renato Rodriguez's plea agreement, the loss amount in the Airbit Club fraud was at least $25 to $65 million. The Government's best estimate is that Airbit Club defrauded thousands of victims around the world, with over 500 victims submitting impact statements for sentencing. Because the perpetrators of the Airbit Club scheme converted much of the fraud proceeds to Bitcoin, and the price of Bitcoin rose significantly, the perpetrators' profits from the fraud were significantly greater than the losses. The Government forfeited approximately $100 million in fraud proceeds and determined that Pablo Renato Rodriguez had other Bitcoin from the fraud that the Government was unable to locate.

In that case, Judge Daniels sentenced: (1) Airbit Club co-founders Pablo Renato Rodriguez and Gutemberg Dos Santos to 144 months' and 40 months' imprisonment, respectively; (2) senior Airbit Club promoter Cecilia Millan to 60 months' imprisonment; (3) Airbit Club attorney Scott Hughes to 18 months' imprisonment; and (4) senior Airbit Club promoter Karina Chairez to one year and one day's imprisonment. Tacuri is most akin to Millan, who also caused millions of dollars in losses to the

---

[5]

victims who "invested" in Airbit Club through her. The Government notes this to assure the Court that significant sentences of imprisonment in crypto-Ponzi prosecutions that resulted in millions in losses for victims are wholly appropriate, and acknowledges that Tacuri, of course, must be sentenced based on his individual circumstances.

### 2. The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The need for the sentence to promote respect for the law and to afford adequate deterrence further supports imposition of a very significant sentence of imprisonment. As Judge Sullivan explained in justifying a very serious sentence for another Ponzi-schemer,[6]

> George Washington once wrote that the "true administration of justice is the firmest pillar of good government." … Clearly, the true administration of justice requires a decent regard for victims, who turn to the Court for protection, or at the very least for vindication, and for a reaffirmation of the law and the values that underlie it. Petitioner showed no respect for that law, and no regard for those values, when he plundered the savings of his victims.

*Nicholson v. United States*, Nos. 11 Civ. 3835 (RJS), 09 Cr. 414 (RJS), 2014 WL 4693615, at *13 (Sep. 22, 2014). Here, too, Tacuri "showed no respect for th[e] law … when he plundered the savings of his victims." Having told his victims that he was providing them with a wholly legal way of making guaranteed money in the burgeon-

---

[6] Judge Sullivan sentenced Nicholson to 40 years' imprisonment, but Nicholson caused losses in excess of $100 million to his victims. *Nicholson*, 2014 WL 4693615, at *2.

13

ing field of cryptocurrency, while using that money for himself and his co-conspirators, Tacuri repeatedly flouted the law. And this was not a one-off mistake; Tacuri had a prior record with crypto-Ponzi schemes, as noted above, and was involved in the Forcount scheme for at least two years..

Given this, Tacuri demonstrates little reason to believe that he will respect the law—or give others a reason to respect the law—absent a very significant prison term. Indeed, it appears that Tacuri supported himself—and thrived—for many years exclusively through Ponzi schemes. It is difficult to see how Tacuri would not be tempted to immediately return to this shadowy life were he to receive the "well-below" Guidelines sentence that he asks this Court to impose.

A significant sentence of imprisonment would also serve general deterrence and promote respect for the law in the public. The below-Guidelines sentence requested by Tacuri would diminish respect for the law and undermine general deterrence, as it would be seen as a slap on the wrist for a defendant who was a key driver in the success of a long-running, large-scale scheme to defraud thousands of innocent victims of their hard-earned money. A below-Guidelines sentence would have a particularly negative effect here because it would send a message to those who would steal from unsophisticated working-class investors that they can engage in criminal conduct without facing the most serious consequences. A sentence at or near the top of the Guidelines range, on the other hand, would send an important message that white-collar criminal laws protect the powerful and powerless alike.

### 3. The History and Characteristics of the Defendant

Tacuri requests an unspecified "well-below" Guidelines sentence based upon: (1) his supposed remorse; (2) his family ties; (3) his lack of criminal history; (4) his supposedly low risk of recidivism; (5) his immigration status and likely deportation; (6) his time in custody at the MDC; and (6) general principles of individualized sentencing and the parsimony principle.

With respect to Tacuri's supposed remorse, the Government respectfully submits that it is too little too late. As detailed in the PSR, Forcount was neither Tacuri's first, nor last, Ponzi scheme—it was only his longest. (PSR ¶ 61). Tacuri might have felt remorse after his first forays into this shady world, but, no, he was emboldened. He saw how it easy it was to make lots and lots of money without working very hard; all he had to do was tell a few lies convincingly over and over again. Indeed, even after victims began to complain about their inability to access funds and after promoters revolted, as described above, Tacuri kept going with the fraud nonetheless. The time for remorse came and went long ago. Now it is time for Tacuri to face just punishment for his serious crimes.

With respect to Tacuri's family ties, they obviously did little, if anything, to hold him back from committing fraud after fraud. And Tacuri is not a defendant who has young minor children without any other guardian or means of support. The fact that his adult wife will be without her spouse if he is incarcerated simply does not

make this case extraordinary. Moreover, because of the defendant's immigration status, he is likely to be deported following serving his sentence in this case.[7]

With respect to Tacuri's lack of criminal history, that is merely a function of the fact that he has only been charged with his participation in the Forcount scheme. As already discussed, Tacuri has participated in multiple other Ponzi schemes and left a trail of financial destruction in his wake. In other words, his lack of criminal history is not for want of trying. Forcount was not some aberration in an otherwise law-abiding life. Rather, Tacuri's participation in this fraud was consistent with his conduct both before and after the Forcount scheme.

Similarly, with respect to Tacuri's supposedly low risk for recidivism, the PSR reflects that Tacuri has been supporting himself and thriving essentially exclusively through Ponzi schemes. The notion that a "well-below" Guidelines sentence will nonetheless deter Tacuri from returning to this life is absurd. He has a taste for the good life and no other means of attaining it.

With respect to Tacuri's immigration status and the likely collateral consequences associated with his probable deportation, he has no one to blame for that but himself. With respect to his impending deportation, treating this fact alone as a basis for a lenient sentence would amount to a "non-citizen" bonus where non-citizens who commit crimes in the United States do not face the same custodial sentences as U.S. citizens who commit the same sorts of offenses because U.S. citizens do not face the

---

[7] It bears noting that the Government understands that Tacuri's wife withdrew her sponsorship of Tacuri's immigration adjustment application following his arrest.

additional adverse consequence of deportation as a result of their conviction. In any case, the adverse immigration consequences here—which result from the defendant's choice to abuse the laws of this country notwithstanding his status—cannot justify a sentence below the Guidelines in this case, given the nature and circumstances of the offense and need for just punishment.

With respect to Tacuri's time at the MDC, the Government merely notes that jail conditions are inherently unpleasant, and the Bureau of Prisons is working actively to improve conditions at the MDC.[8]

Finally, with respect to generalized principles of individualized sentencing and the parsimony principle, there is nothing new there for the Court to consider. The Court well knows its role in sentencing. This reminder is of no consequence whatsoever.

### 4. Restitution

In connection with Tacuri's guilty plea, the Court entered a consent order of forfeiture comprising a money judgment of $3,610,718.67 and forfeiture of a home in Florida that Tacuri purchased in part with crime proceeds. (Dkt. 83). The Court should orally include forfeiture in the sentence and include forfeiture in the judgment consistent with the terms of the Consent Preliminary Order of Forfeiture. The Government respectfully requests that the Court impose restitution in the same amount as the forfeiture money judgement.

---

[8] *See* https://www.bop.gov/resources/pdfs/mdc_bro_uat_fact_sheet.pdf?v=1.0.0 (last visited September 27, 2024).

## III. Conclusion

For the reasons set forth above, this Court should sentence Tacuri to a sentence at or near the top of his Guidelines range of 108 to 135 months' imprisonment, with significant forfeiture and restitution. Such a sentence would be sufficient, but not greater than necessary, to accomplish the goals set forth in 18 U.S.C. § 3553(a).

Dated:   New York, New York
         September 27, 2024

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney

         By:      _____
                                    Benjamin A. Gianforti
                                    Michael D. Maimin
                                    Assistant United States Attorneys
                                    (212) 637-2490 / -2340